UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN ANTONIO POOLE,

      Petitioner,

                             Case No. 09-13818

v.

                             Honorable Patrick J. Duggan

DEBRA SCUTT,

      Respondent.

_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS, DENYING AN EVIDENTIARY HEARING, GRANTING IN PART A CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

John Antonio Poole ("Petitioner"), a state prisoner currently confined at the Kinross Correctional Facility in Kincheloe, Michigan, has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his convictions of first-degree murder, Michigan Compiled Laws § 750.316, felony-firearm, Michigan Compiled Laws § 750.227b, and possession of a firearm by a convicted felon, Michigan Compiled Laws § 750.224f. Petitioner has also filed a "motion for guidance," with respect to this Court's December 22, 2011 order granting Petitioner's motion to expand the record, but denying his motion for an evidentiary hearing. Petitioner claims to have new exculpatory evidence that can only be developed through an evidentiary hearing. To the extent that Petitioner seeks reconsideration of this order, his motion is denied. The Court also concludes that Petitioner's habeas claims lack merit, and therefore denies the petition.

The Court believes, however, that a certificate of appealability should issue with respect to certain claims.

## I. Background

The Court recites the facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1):

> [Petitoner's] convictions arise out of the shooting death of Henry Covington on December 12, 2001, around 6:45 a.m., outside a home where Covington resided with his fiancé, Delora Lester. A few months before the shooting, Lester had purchased a house from Harold Varner, [Petitioner's] uncle and a codefendant in this case. Lester indicated that she did not have enough money to close on the home and had to borrow money from Varner. Lester testified that she had problems with Varner when she attempted to take possession of the home she purchased, and ultimately she and Covington had to leave the home after someone threw a firebomb through the kitchen window.
>
> On December 12, 2001, Varner called Amanda Coddington, who managed properties for Varner and had a child with him, at 5:00 a.m. to ask her to meet him at a gas station.[1]  Coddington met Varner and then went to pick up [Petitioner]. [Petitioner] got into a white Explorer with Varner first and then he got into the car with Coddington. Varner told Coddington to follow him and Coddington drove to an area near where Lester and Covington were living. [Petitioner] exited the car and went to an alley heading toward Lester's house. Coddington indicated that [Petitioner] was gone approximately 15 minutes.
>
> Lester was inside the home when she heard four shots fired. After hearing the shots, she ran to the door. Lester could hear Covington yelling and when she opened the door, Covington fell into the hallway. Coddington, who was still at her car, also heard four shots and after the shots, [Petitioner] returned to the car holding a .357 gun. [Petitioner] put the gun in a shopping bag on the floor. Coddington asked [Petitioner] what happened. [Petitioner] initially said,

---

[1] Testimony from Coddington about [Petitioner] and Varner was presented at trial by way of cross-examining Coddington using her testimony given at the preliminary examination. At trial, Coddington recanted much of her preliminary examination testimony that implicated [Petitioner] in the shooting. Coddington testified at trial, that she did not go any where [sic] with [Petitioner] on December 12, 2001 and that she was threatened by the police to give a statement implicating [Petitioner] and Varner.

"don't worry about it, just go." [Petitioner] later informed Coddington that he shot someone, but did not specify whom he shot. [Petitioner] left the gun in Coddington's car and she later threw the gun into a dumpster.

Coddington indicated that Varner told her later that day that Covington had been shot. A day or two after the shooting, Varner said to Coddington that he paid [Petitioner] $300 to kill someone and that he was annoyed that [Petitioner] kept calling him about more money. Varner said he did not know why [Petitioner] kept phoning him, and that he was going to pay [Petitioner] more when everything died down. Coddington testified that Varner told her that having Covington shot made it easier to deal with Lester and the problems she had with the home she had purchased from him.

On December 18, 2001, Varner was arrested based on information the police obtained from Coddington. Varner asked to speak to Sergeant Kenneth Gardner, one of the investigating officers. Gardner interviewed Varner on December 20, 2001. Gardner testified that Varner offered to give information about a separate murder, in exchange for receiving a deal in this case. Gardner testified that Varner told him that a few days after the shooting, [Petitioner] told Varner that he shot Covington.

Vaudi Higginbotham, a cell mate of Varner's, testified that Varner told him that he was going to have a female named Amanda stage a fake compliant [sic] against the police and that he gave his nephew $300 and a gun to kill a guy. Higginbotham testified that Varner told him that he had Coddington take [Petitioner] to kill the guy and that "he couldn't sleep at night until he killed this guy . . . or had this guy killed."

*People v. Poole*, No. 244023, at 1-2 (Mich. Ct. App. Dec. 5, 2005) (per curiam).[2]

Neither Petitioner nor Harold Varner testified or presented any witnesses at trial.

Petitioner's defense was that there was no physical evidence linking him to the crime, that

Coddington and Higginbotham were not credible witnesses, and that the prosecution had

not proven its case beyond a reasonable doubt.

On July 30, 2002, the jury found Petitioner guilty of first-degree premeditated

---

[2] The Court has omitted one irrelevant footnote concerning Varner's appeal. The other footnote appears in the original state court opinion as footnote two.

murder, felony-firearm, and felon in possession of a firearm.[3]   The trial court sentenced

Petitioner to two years in prison for the felony-firearm conviction, followed by concurrent

sentences of life imprisonment for murder and twenty-four to ninety months for felon-in-

possession.

In an appeal of right, Petitioner alleged that his right of confrontation was violated

by the use of inadmissible hearsay from a non-testifying co-defendant.  He further alleged

that his right to the effective assistance of counsel was violated by his attorney's failure to

object to this evidence.  The Michigan Court of Appeals affirmed Petitioner's convictions

in an unpublished *per curiam* opinion.  Petitioner raised the same issues in the Michigan

Supreme Court, which denied leave to appeal on August 29, 2006.  *People v. Poole*, 476

Mich. 863, 720 N.W.2d 302  (Mich. 2006).

On August 6, 2007, Petitioner filed a motion for relief from judgment in the trial

court, alleging ineffective assistance of counsel.  The trial court denied the motion in a

reasoned opinion.

In an appeal from the trial court's decision, Petitioner argued that: (1) trial counsel

was ineffective for failing to investigate and present witnesses; (2) trial counsel was

ineffective for opening the door for the prosecutor's comment about Amanda Coddington

taking a polygraph examination; (3) newly discovered exculpatory evidence required

relief from the judgment; (4) appellate counsel was "cause" for the failure to raise some

---

[3] Originally, Harold Varner was charged with first-degree murder.  This charge was later
amended to second-degree murder, Michigan Compiled Laws § 750.317, and Varner was
subsequently convicted of this offense.

claims on direct appeal; and (5) the trial court's decision should be reversed.  The

Michigan Court of Appeals denied leave to appeal because Petitioner "failed to meet the

burden of establishing entitlement to relief under [Michigan Court Rule] 6.508(D)."

*People v. Poole*, No. 285843 (Mich. Ct. App. Oct. 8, 2008).  On June 23, 2009, the

Michigan Supreme Court denied leave to appeal for the same reason.  *People v. Poole*,

483 Mich. 1107, 766 N.W.2d 846 (Mich. 2009).

Petitioner filed his habeas corpus petition on September 28, 2009.  In his petition,

Petitioner alleges that: (1) the state court's decision on his claim under the Confrontation

Clause was an unreasonable application of Supreme Court precedent; (2) trial counsel

was ineffective for failing to object to inadmissible hearsay from a non-testifying co-

defendant; (3) trial counsel was ineffective for failing to investigate and present certain

witnesses at trial; (4) trial counsel was ineffective for asking a question that opened the

door for the prosecutor to argue inadmissible evidence concerning a polygraph test taken

by Amanda Coddington; (5) newly discovered evidence of a witness is exculpatory

evidence requiring relief from the convictions; (6) appellate counsel was "cause" for the

failure to raise some claims on direct appeal; and (7) the trial court's opinion and order on

his motion for relief from judgment is erroneous.

## II. Procedural Default

The State argues that habeas claims three through five are procedurally defaulted, as

Petitioner raised these claims for the first time in his motion for relief from judgment and

the state appellate courts denied leave to appeal pursuant to Michigan Court Rule

5

6.508(D).[4]  "Brief orders citing Michigan Court Rule 6.508(D) are not explained orders invoking a procedural bar."  *Guilmette v. Howes*, 624 F.3d 286, 289 (6th Cir. 2010) (en banc).  The Court therefore looks to the last reasoned state court decision to determine the basis for the state court's rejection of Petitioner's claims.  *See id.* at 291.  The trial court relied on federal law, including *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), when addressing Petitioner's claims concerning the effectiveness of trial counsel.  Because the trial court's decision was the last reasoned decision and this decision rested primarily on federal law, the Court presumes that the unexplained appellate orders, which left the trial court's decision in place, did not invoke a procedural default.  *See Guilmette*, 624 F.3d at 292.  The Court concludes that Petitioner's claims three through five are not

---

[4]  Michigan Court Rule 6.508(D) provides in relevant part:

> (D) Entitlement to Relief.  The defendant has the burden of establishing entitlement to the relief requested.  The court may not grant relief to the defendant if the motion

> . . . .

>> (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence . . . unless the defendant demonstrates

>>> (a) good cause for failure to raise such grounds on appeal . . . , and

>>> (b) actual prejudice from the alleged irregularities that support the claim for relief.

> . . . .

> The court may waive the "good cause" requirement of subrule (D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime.

procedurally defaulted, and proceeds to consider all of Petitioner's claims on the merits.

### III. Standard of Review

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, --- U.S. ----, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, state prisoners are not entitled to the writ of habeas corpus unless the state court's adjudication of their claims on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S. Ct. at 1523.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

decision." *Richter*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149 (2004)).  To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on a claim "was so lacking in justification" that it resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87.  A court may not issue the writ "simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411, 120 S. Ct. at 1522.

## IV.  Analysis

### A. Confrontation Clause

Petitioner alleges that his constitutional right of confrontation was violated by the introduction of testimony regarding Harold Varner's out-of-court statements to jail inmate Vaudia Higginbotham and to Detroit Police Sergeant Kenneth Gardner.  Higginbotham testified at trial that Varner talked about his case while the two of them were confined in jail.  According to Higginbotham, Varner said that he had paid his nephew $300 to kill a man on Nottingham Street.  Trial Tr. vol. IV, 201, July 25, 2002.  Varner also stated that he made his secretary, Amanda, take his nephew to the victim's house and that he gave his nephew a .357 caliber gun to use in the crime.  Trial Tr. vol. IV, 174-75, 201.

Sergeant Gardner testified that he interviewed Varner on December 20, 2001, while Varner was in police custody.  Varner offered to provide information on an unrelated homicide case in return for a deal in the Henry Covington case.  Varner then told Sergeant Gardner that, two days after Covington was shot, Varner's nephew "Tony" had

told Varner that he (Tony) had shot Covington.[5]  Trial Tr. vol. IV, 27.  Tony had said that

he thought that Covington was reaching for a gun.  Trial Tr. vol. IV, 28.

On appeal, the Michigan Court of Appeals concluded that Varner's statements to

Higginbotham were not testimonial, and therefore, did not implicate the Confrontation

Clause.  *People v. Poole*, No. 244023, at 3.  As for Varner's statement to Gardner, the

Court of Appeals concluded that those comments were testimonial and erroneously

admitted in evidence.  *Id.* at 4.  The court determined, however, that the error was

harmless in light of other admissible evidence implicating Petitioner in the crime.  *Id.*

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted

with the witnesses against him."  U.S. Const. amend. VI.  Testimonial hearsay evidence

may not be introduced against a criminal defendant unless the declarant is unavailable

and the defendant had a prior opportunity for cross-examination.  *Crawford v.*

*Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004); *Peak v. Webb*, 673 F.3d 465,

471-72 (6th Cir. 2012).

The threshold question is whether the out-of-court statements were "testimonial."

*United States v. Mooneyham*, 473 F.3d 280, 286 (6th Cir. 2007).  The proper inquiry "is

whether the declarant intends to bear testimony against the accused."  *United States v.*

*Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).  The Court should consider "whether a

reasonable person in the declarant's position would anticipate his statement being used

against the accused in investigating and prosecuting the crime."  *Id.* at 675.  If a statement

---

[5]  Petitioner was known as "Tony."  Trial Tr. vol. IV, 213.

9

is not testimonial in nature, the Confrontation Clause has "no application."  *Whorton v. Bockting*, 549 U.S. 406, 420, 127 S. Ct. 1173, 1183 (2007).

The Michigan Court of Appeals reasoned that Varner's statements to Higginbotham were nontestimonial in nature, as they were made to a fellow inmate rather than a government employee.  There is ample authority for the proposition that conversations between inmates are not "testimonial" for purposes of the Confrontation Clause.  *See Davis v. Washington*, 547 U.S. 813, 825, 126 S. Ct. 2266, 2275 (2006) (indicating that "statements from one prisoner to another" are "clearly nontestimonial"); *United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009) (statement to inmate who was acting as a confidential informant is nontestimonial, as the declarant would not anticipate such a statement being used in a criminal proceeding); *see also United States v. Pelletier*, 666 F.3d 1, 9 (1st Cir. 2011) (collecting cases).  The state court correctly concluded that Varner's statements to Higginbotham did not implicate the Confrontation Clause.

With respect to Varner's statements to Sergeant Gardner, the Michigan Court of Appeals concluded that the statements were testimonial in nature.  "[I]nterrogations by law enforcement officers fall squarely within" the class of statements with which the Confrontation Clause is concerned.  *Crawford*, 541 U.S. at 53, 124 S. Ct. at 1365.  As the Court of Appeals noted, Varner was under arrest and incarcerated at the time he gave his statement.  Although Varner instigated the interview, Gardner read him his constitutional rights and obtained a waiver of those rights from Varner.  Under these circumstances, a reasonable person would assume that his statement would be used in prosecuting a crime.  In fact, Varner apparently intended for the information to be used in this way, as he had

hoped to make a deal in which he would obtain more a favorable sentence in exchange for his testimony.  The state court correctly determined that the statement to Gardner was testimonial in nature, and its admission violated Petitioner's Confrontation Clause rights.

The state court concluded, however, that relief was not warranted because the error was harmless.  A violation of the Confrontation Clause can be harmless error.  *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986).  "[A]n error is harmless unless it had a substantial and injurious effect or influence in determining the jury's verdict."  *Tolliver v. Sheets*, 594 F.3d 900, 924 (6th Cir. 2010) (citing *Fry v. Pliler*, 551 U.S. 112, 116, 127 S. Ct. 2321, 2325 (2007)).  "If the court is certain that the error had no or a small effect, the error is harmless."  *Id.*  "[W]hen, in contrast, 'a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless.  And, the petitioner must win.'"  *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S. Ct. 992, 994 (1995)).

Sergeant Gardner's testimony was not the only evidence that indicated Petitioner committed the crimes at issue.  Higginbotham's testimony was properly admitted in evidence, and according to him, Varner admitted to paying his nephew $300 to kill a man on Nottingham Street.  Trial Tr. vol. IV at 201.  According to Higginbotham, Varner also admitted that he gave his nephew a .357 caliber gun to use and that he asked his secretary, Amanda, to take his nephew to the man's house.  Trial Tr. vol. IV at 174-75, 201.

In addition to Higginbotham's testimony, Amanda Coddington was impeached with her testimony from the preliminary examination.  At the preliminary examination, she had

testified as follows.  She met Harold Varner at a gas station early on December 12, 2001,

at Varner's request.  The two of them then went to Tony's house.  Varner had wanted her

to follow someone to work, but Tony got in her car, and she took him to Delora Lester's

house on Nottingham Street in Detroit.  She parked on the next street and noticed Varner

circling the area in his vehicle.  Tony exited the car and walked toward Lester's house.

She later heard gunshots, and Tony came running back to her car with a .357 caliber gun

in his hand.  He said that he had shot and killed the man.  Later, Varner stated that he had

paid Tony $300 to shoot Henry Covington and that he intended to pay him more money

when everything died down.  Trial Tr. vol. III, 116-43, July 24, 2002.

Police Officer Michael Carlisle testified that Coddington provided him with similar

information when he interviewed her.  Trial Tr. vol. IV, 58-61, 65-67.  Coddington also

informed Officer Carlisle that the shooter was the nephew of Varner's wife, and, after the

shooting, she threw the gun in a dumpster on a side street.  She claimed that the reason

she had not provided any information earlier was that Harold Varner had been taking care

of her, she did not want to believe he had anything to do with the murder, and she was

afraid of both him and Tony.

It was the defense's theory that Coddington's previous statements were coerced by

Officer Miguel Bruce.  Coddington testified at trial that Bruce had been harassing her

with repeated phone calls requesting sex and that he had assaulted her at a hotel.  Trial Tr.

vol. III, 245-50.  The prosecutor, however, introduced evidence undermining this theory.

Phone records indicated that Coddington made a number of calls of varying lengths to

Bruce during the general time frame when she claimed that Bruce was harassing her.

12

Trial Tr. vol. III, 257-62.  A waitress testified that she served Bruce and Coddington at a local restaurant near the time of the alleged assault, and observed no signs of conflict or friction between them.  Trial Tr. vol. V, 7-9, July 26, 2002.  In addition, an employee of the hotel testified that he did not receive any requests for assistance or hear any cries for help on the day in question.  Trial Tr. vol. V, 16-17.

Marlita Moncreif testified that she lived with her sister and Petitioner, who was her sister's boyfriend, during the week of the shooting.  She admitting telling the police that, one day that week, Petitioner came home at 7:18 a.m. and said that he had been with his uncle, Harold Varner.  Trial Tr. vol. IV, 217-20, 235.

In light of the admissible evidence implicating Petitioner, the Court does not believe that the trial court's error in admitting Sergeant Gardner's testimony had a substantial and injurious effect or influence in determining the jury's verdict.  The Court concludes that the error was harmless, and Petitioner has no right to relief on this ground.

**B. Ineffective Assistance of Counsel**

To demonstrate that he was denied the effective assistance of counsel under federal constitutional standards, Petitioner must satisfy a two-prong test.  First, he must show that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064 (1984).  In so doing, Petitioner must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance.  *Id.* at 689, 104 S. Ct. at 2065.  In other words, Petitioner "must overcome the presumption that, under the circumstances, the challenged

13

action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S. Ct. at 2065 (quoting

*Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 164 (1955)). Second, Petitioner

must show that the deficient performance prejudiced his defense. *Id.* at 687, 104 S. Ct. at

2064. To demonstrate prejudice, Petitioner must show that "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Id.* at 694, 104 S. Ct. at 2068. "The likelihood of a different

result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792. Petitioner

bears the burden of demonstrating a reasonable probability that the result of the

proceeding would have been different but for counsel's allegedly deficient performance.

*Wong v. Belmontes*, --- U.S. ----, 130 S. Ct. 383, 390-91 (2009).

On habeas review, "[t]he question 'is not whether a federal court believes the state

court's determination' under the *Strickland* standard 'was incorrect but whether that

determination was unreasonable - a substantially higher threshold.'" *Knowles v.

Mirzayance*, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420 (2009) (quoting *Schriro v.

Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007)). The pivotal question is

whether the state court's application of the *Strickland* standard was unreasonable, not

whether defense counsel's performance fell below the *Strickland* standard. *Richter*, 131

S. Ct. at 785. "[B]ecause the *Strickland* standard is a general standard, a state court has

even more latitude to reasonably determine that a defendant has not satisfied that

standard." *Knowles*, 556 U.S. at 123, 129 S. Ct. at 1420 (citing *Alvarado*, 541 U.S. at

664, 124 S. Ct. at 2149 (2004)). Thus, a "doubly deferential judicial review" applies to

*Strickland* claims brought by habeas petitioners. *Id.* (citing *Yarborough v. Gentry*, 540

14

U.S. 1, 5-6, 124 S. Ct. 1, 4 (2003)).  This means that on habeas review of a state-court conviction, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."  *Richter*, 131 S. Ct. at 785.  "'Surmounting *Strickland*'s high bar is never an easy task.'"  *Id.* at 788 (quoting *Padilla v. Kentucky*, --- U.S. ----, 130 S. Ct. 1473, 1485 (2010)).

*1. Failure to Object to Hearsay*

Petitioner alleges first that his trial attorney was ineffective for failing to object to the admission of Varner's statements to Sergeant Gardner and Vaudia Higginbotham.  As explained above, Varner's statements to Higginbotham were not testimonial, and the admission of Varner's statements to Sergeant Gardner was harmless error.  Thus, there was no basis for objecting to testimony concerning the statements to Higginbotham, and the failure to object to the testimony concerning the statements to Sergeant Gardner did not prejudice the defense.  Petitioner is therefore not entitled to relief on this claim.

*2. Actual Innocence; Failure to Investigate and Present Witnesses*

Petitioner claims next that his trial attorney was ineffective for failing to investigate and present witnesses at trial.  Petitioner purports to have new evidence from Bridgette Woodall, who claims in a 2002 affidavit that she observed a very tall man with no facial hair shoot into a gray car on Nottingham Street at approximately 6:45 a.m. on December 12, 2001.  Woodall Aff. ¶ 13.  Petitioner claims that his attorney should have investigated and produced Ms. Woodall as a witness at trial because he does not fit the description of the shooter that Ms. Woodall saw.  In a related claim (claim five), Petitioner asserts that Ms. Woodall's affidavit is exculpatory evidence which entitles him to relief from the

judgment.  Petitioner also believes that his attorney should have called as witnesses a number of inmates at the jail who could have contradicted Higginbotham's testimony.

"[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404, 113 S. Ct. 853, 862 (1993).  For this reason, Petitioner has no right to habeas relief on his claim that Ms. Woodall's affidavit is exculpatory evidence entitling him to relief.

The remaining question is whether trial counsel was ineffective for failing to investigate and present Ms. Woodall and the jail inmates as witnesses.  Petitioner asserts that Ms. Woodall would have testified that he was not the shooter.  He claims that the inmates would have testified that Varner did not make any incriminating statements to Vaudia Higginbotham.

The trial court adjudicated Petitioner's claim on the merits and refused to second-guess trial counsel's strategic decisions.  The trial court opined that Petitioner's assertions regarding potential witnesses were speculative at best because most, if not all, of the inmates would not have testified in Petitioner's behalf while they were still in jeopardy and because Ms. Woodall never made a statement to the police.  The trial court concluded that trial counsel was not professionally deficient in her representation of Petitioner.

Attorneys have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

16

*Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066.  The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).  The relevant question is whether counsel's choices were reasonable. *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 1037 (2000) (citing *Strickland*, 466 U.S. at 688, 104 S. Ct. 2065).  The Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." *Knowles*, 556 U.S. at 123, 129 S. Ct. at 1420.

Petitioner's trial attorney was not ineffective for failing to investigate and produce Bridgette Woodall as a witness, because Ms. Woodall admits in her affidavit that she did not notify the police about the shooting on Nottingham.  Woodall Aff. ¶ 19.  Thus, trial counsel could have not known Ms. Woodall was an eyewitness to the crime.  The police, in fact, canvassed the neighborhood for witnesses and did not learn of Ms. Woodall.[6] Detective Derryck Thomas's investigation led him to Clarence Burnside, who lived behind the house where the shooting occurred.  Burnside provided Detective Thomas with information concerning a small, damaged red vehicle, which was subsequently found to belong to Amanda Coddington and linked to Harold Varner.  Burnside also provided a description of the shooter which matched Petitioner.  Trial Tr. vol. III, 52-56, 62-63, 72-74.  Detective Thomas testified that there were some leads which the police did not pursue because they found who they were looking for.  Trial Tr. vol. III, 67.  "[T]he duty

---

[6] According to Ms. Woodall's affidavit, she was at the time living at a location several blocks away from the area where the shooting occurred.  *See* Woodall Aff. ¶¶ 1-3.

to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383, 125 S. Ct. 2456, 2463 (2005). Petitioner's counsel had no reason to believe that further investigation would reveal additional witnesses.

Moreover, even if trial counsel had discovered Ms. Woodall, she might not have testified. She states in her affidavit that she did not want to get involved because she was afraid of the shooter, who noticed her at the time of the shooting and told her to mind her own business. Woodall Aff. ¶¶ 15, 37. Although she claims that her fear subsided as the months passed, she never contacted the police. *Id.* ¶ 38. The Court concludes that Petitioner has failed to establish prejudice from trial counsel's failure to locate Ms. Woodall.

The other witnesses in question were inmates who were confined at the Wayne County Jail with Harold Varner and Vaudia Higginbotham. These inmates allege in affidavits signed in 2004 and 2005 that Varner and Higginbotham did not get along. They claim that Varner never confessed to killing someone and never talked about his case with Higginbotham. Petitioner alleges in an affidavit that he asked his trial attorney to contact any jail inmates who might have been present when Varner talked with Higginbotham about his case. According to Petitioner, his attorney responded that the government's case was weak and it was unnecessary to contact or produce the inmates.

Higginbotham did testify that another inmate was present when Harold Varner told him that he intended to have Amanda Coddington stage a fake rape charge against the

18

officer in charge of the case to make the officer look bad.  Trial Tr. vol. IV, 170-72.

Higginbotham also named some inmates who were present during a Bible study when

Varner talked about his pride being the reason he was locked up.  Trial Tr. vol. IV, 174,

186, 203.  But the record is unclear as to whether the other inmates were present when

Varner told Higginbotham about providing his nephew with a gun, paying his nephew to

kill a man, and surveying the area for days when trying to have the man killed.  It appears

that Varner's incriminating comments were made to Higginbotham in confidence, for

Higginbotham testified that Varner informed *him* of these things and that he

(Higginbotham) mentioned these things to only one person, a homicide detective.  Trial

Tr. vol. IV, 174-75, 201-02.  The other inmates would not have known what Varner said

to Higginbotham when they were not present, and as the trial court recognized, it was

speculative at best as to whether these inmates would have actually testified.

The Court also believes that Petitioner has failed to establish prejudice from his

counsel's failure to call the inmates to testify.  Higginbotham's testimony was not the

only evidence against Petitioner.  Amanda Coddington was impeached with her prior

testimony, which implicated Petitioner in the crime, and this testimony was corroborated

by Officer Carlisle, who had taken a statement from her.  As noted above, the prosecutor

also introduced evidence that undermined Coddington's claim that her prior testimony

had been coerced.  Petitioner has not shown a substantial likelihood that the result of the

trial would have been different had trial counsel investigated and called the inmates as

witnesses.

Even if trial counsel was ineffective, the Court believes that fairminded jurists could

19

disagree on the correctness of the state court's ruling that trial counsel was not ineffective.  Petitioner has failed to show that the state court's ruling "was so lacking in justification" that it resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*, 131 S. Ct. at 786-87. Petitioner has no right to relief on the ground that his trial attorney failed to investigate and call Ms. Woodall or the inmates as witnesses.

### 3. Opening the Door to a Comment on Coddington's Polygraph Test

Petitioner's third claim of ineffectiveness is that his attorney opened the door for the prosecutor to argue evidence about a polygraph test taken by Amanda Coddington.  This occurred during trial counsel's cross-examination of Officer Roy McAllister.  Counsel asked Officer McAllister whether Amanda Coddington left the police precinct after she gave her second statement.  Officer McAllister responded, "She left, but it wasn't to leave – if I can recall, I believe she was going to take a polygraph, ma'am."  Trial Tr. vol. III, 101.

Trial counsel effectively handled the reference to a polygraph by ignoring it and by asking whether Coddington later returned to the precinct as a suspect or on her own volition.  If trial counsel had asked to have Officer McAllister's remark struck, and if the trial court had instructed the jury to disregard the remark, it likely would have drawn the jury's attention to the fact that Coddington took a polygraph test.  *See United States v. Iron Thunder*, 714 F.2d 765, 772 (8th Cir. 1983) (cautionary jury instruction to disregard an officer's remark that he was a polygraph examiner "would most likely draw the jury's attention directly to the fact which the defendants now complain should not have been

considered").  Petitioner nevertheless contends that trial counsel's failure to move to have the unsolicited remarks stricken from the record led to the prosecutor vouching for the credibility of Amanda Coddington.  Although prosecutorial vouching is improper, *United States v. Reid*, 625 F.3d 977, 982 (6th Cir. 2010), the prosecutor simply stated during her rebuttal argument that Amanda had been taken for a "poly."  Trial Tr. vol V, 109.  The prosecutor's remark was a fleeting one, as was Officer McAllister's remark, and there was no other reference to the polygraph during trial.  Nor was there any mention of the results of the polygraph.  The Court believes that the comments about a polygraph could not have had a substantial and injurious effect or influence on the jury's verdict, and were therefore harmless.  Because the comments were harmless, trial counsel's failure to object or to move to strike Officer McAllister's remark did not prejudice the defense.  The Court concludes that Petitioner is not entitled to relief on his claim of ineffective assistance.

## C. Appellate Counsel's Failure to Raise Claims on Appeal

Petitioner alleges that his appellate attorney was "cause" for his failure to raise all of his claims on direct appeal.  The Court, however, has determined that Petitioner's claims are not procedurally defaulted.  It is therefore unnecessary to consider whether Petitioner has shown cause for his failure to raise his claims on direct appeal.

## D. Error in the Trial Court's Opinion and Order

Petitioner's seventh claim alleges that the trial court's opinion and order on his motion for relief from judgment is erroneous and should be reversed.  Specifically, he claims that the trial court incorrectly framed the issues, misconstrued his arguments and his request for an evidentiary hearing, and erroneously speculated that Ms. Woodall's

affidavit was incredible without conducting an evidentiary hearing.  Petitioner also alleges that the trial court erroneously discounted Ms. Woodall's affidavit without considering suspect testimony by Amanda Coddington and Vaudia Higginbotham.

The Court took these arguments into consideration when adjudicating Petitioner's third and fifth claims regarding newly discovered evidence and trial counsel's failure to investigate and present witnesses.  It is unnecessary to consider whether Petitioner has stated a separate basis for relief.  Furthermore, to the extent that Petitioner complains about deficiencies in the trial court's post-conviction procedures and the trial court's failure to hold an evidentiary hearing, his claim is not cognizable on habeas review. "[R]elief may not be granted to a habeas petitioner for alleged deficiencies in a state's post-conviction procedures because such claims relate to a state civil matter, not the custody of a defendant."  *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002) (citing *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986)).

## V. Certificate of Appealability

Section 2253 provides that a certificate of appealability may issue only if a petitioner makes a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2). As the Supreme Court has stated:

> "[T]he petitioner need not show that he should prevail on the merits.  He has already failed in that endeavor.  Rather, he must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further."

*Barefoot v. Estelle*, 463 U.S. 880, 893 n.4, 103 S. Ct. 3383, 3394 n.4 (1983) (quoting

*Gordon v. Willis*, 516 F. Supp. 911, 913 (N.D. Ga. 1980)) (emphasis added and internal

citation and quotation marks omitted).  As the Supreme Court more recently stated, when a district court denies a habeas petition on the merits of the claims presented, a certificate may issue if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000).

While the Court continues to believe that Petitioner is not entitled to a writ of habeas corpus for the reasons set forth above, the Court believes that the issues of whether the Confrontation Clause error was harmless and whether trial counsel was ineffective for failing to investigate and call certain witnesses may be "debatable among jurists of reason."  For this reason, the Court does not believe that Petitioner should be denied the opportunity to seek appellate review of these issues.  The Court does not find the remaining issues raised in the petition debatable among jurists of reason.

## VI.  Conclusion

Accordingly,

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that an evidentiary hearing is unnecessary.  To the extent Petitioner's motion for guidance seeks an evidentiary hearing, his motion is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **GRANTED** with respect to the following issues, only:

(1) Whether the state court's decision on Petitioner's claim under the

23

Confrontation Clause was an unreasonable application of Supreme Court precedent; and

(2) Whether Petitioner was denied the effective assistance of counsel by his trial counsel's failure to investigate and present witnesses.

**IT IS FURTHER ORDERED** that Petitioner may proceed *in forma pauperis* on appeal because he was permitted to proceed *in forma pauperis* in the District Court.  *See* Fed. R. App. P. 24(a)(3).

**SO ORDERED**.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:

John Antonio Poole, #350412
Kinross Correctional Facility
16770 S. Watertower Drive
Kincheloe, MI 49788

Mark G. Sands, A.A.G.